1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL CORRALES, JR., a California resident,<br><br>                                         Plaintiff,<br><br>v.<br><br>AMY DUTSCHKE, in her official capacity as the Regional Director of the Bureau of Indian Affairs, Sacramento, California; DEB HAALAND, in her official capacity as U.S. Secretary of Interior; and BRYAN NEWLAND, in his official capacity as Assistant Secretary of the Interior – Indian Affairs,<br><br>                                         Defendants. | Case No.:  23-CV-1876 JLS (DDL)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>(ECF No. 21) |

Presently before the Court is a Motion to Dismiss Plaintiff's First Amended Complaint ("Mot.," ECF No. 21) filed by Defendants Amy Dutschke, Deb Haaland, and Bryan Newland (collectively, "Defendants").  Plaintiff Manuel Corrales, Jr., filed an Opposition to the Motion ("Opp'n," ECF No. 22), to which Defendants submitted a Reply ("Reply," ECF No. 23).  The Court previously took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  *See* ECF No. 24.  Having carefully considered the Parties' arguments and the law, the Court now **GRANTS** Defendants' Motion.

/ / /

## BACKGROUND

Plaintiff, appearing pro se, is an attorney licensed in California.[1]  *See* First Amended Complaint ("FAC") ¶ 13, ECF No. 16.  In December 2007, he entered into a fee agreement ("Fee Agreement") with Silvia Burley of the California Valley Miwok Tribe ("CVMT" or "Tribe") under which he was authorized to initiate litigation on behalf of the Tribe to recover Revenue Sharing Trust Fund ("RSTF") money being withheld by the California Gambling Control Commission ("Commission").  *Id.* ¶ 17.  The Fee Agreement had a hybrid quality, meaning Plaintiff earned both an hourly fee as well as a contingency fee.  *Id.*  The hourly rate was agreed to be $250 per hour, and the contingency fee was agreed to be 20% of CVMT's eventual payout from the Commission, if successfully recovered.  *Id.* ¶ 19.

For the first five months after execution of the Fee Agreement, Plaintiff received monthly payments for his hourly services.  *Id.* ¶ 17.  After that, however, the parties to the Fee Agreement suspended and deferred all payment—including payment based on Plaintiff's hourly fee—until the RSTF funds held by the Commission were released.  *Id.*  Plaintiff, ostensibly content with that arrangement, continued to represent CVMT for thirteen years, accumulating, in his estimation, approximately $5.8 million in earned hourly fees.  *Id.* ¶ 19.  On May 22, 2020, Plaintiff's services were terminated pursuant to Paragraph 8 of the Fee Arrangement, which reads:

> Client shall have the right to discharge [Plaintiff] at any time upon written notice to [Plaintiff].  Such discharge shall not affect [CVMT's] obligation to reimburse [Plaintiff] for costs incurred prior to discharge.  In addition, [Plaintiff] shall be entitled to the reasonable value of legal services performed prior to such

---

[1] Ordinarily, courts have a duty to construe a pro se litigant's pleadings liberally.  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  That liberal pleading standard, however, does not apply to "practicing attorneys" who appear pro se. *Huffman v. Lindgren*, 81 F.4th 1016, 1021 (9th Cir. 2023).

discharge to be paid by [CVMT] from any subsequent recovery

on claims covered by this Agreement.

*Id.* ¶ 19.  Plaintiff submitted a final invoice to CVMT, but to this day he has been unable to recover the funds he believes he is due.  *Id.*

Plaintiff did not enter into the Fee Agreement in a vacuum.  CVMT had been plagued by an interminable leadership dispute dating back decades and ensnarling the tribe in countless lawsuits and administrative proceedings.  *Id.* ¶¶ 23–27.  A brief history of CVMT, which was recounted by a court handling one such lawsuit, is necessary to understand the context surrounding the Fee Agreement and the controversy that led to this lawsuit:

In 1915, John Terrel of the Office of Indian Affairs conducted a census of "Sheepranch Indians" in Calaveras County, California.  At the time of the census, there were thirteen Sheepranch Indians.  In 1916, the United States acquired a 0.92 acre parcel of land, known as "Sheep Ranch Rancheria," for these Indians.

In 1934, Congress passed the Indian Reorganization Act ("IRA"), which required the [Bureau of Indian Affairs ("BIA")] to hold elections where a tribe would decide whether to accept provisions of the IRA, including provisions permitting tribes to organize and adopt a constitution.  25 U.S.C. §§ 5123, 5125.  The BIA found that there was only one eligible adult Miwok Indian, Jeff Davis, living on the rancheria in 1935.  He voted in favor of adopting the IRA but the Tribe never pursued formal organization.

Amended in 1964, the California Rancheria Act authorized the termination of federal recognition of California Rancherias by distributing each rancheria's assets to the Indians

residing on the rancheria. At that time, Mabel Dixie was the sole Miwok resident on the land. She voted to accept the land distribution plan and terminate the trust relationship between the federal government and the Tribe. The BIA failed, however, to take the necessary steps to complete the termination of the rancheria.

*Cal. Valley Miwok Tribe v. Zinke*, No. 2:16-01345 WBS CKD, 2017 WL 2379945 (E.D. Cal. June 1, 2017).

Mabel Dixie's heirs—or, the Dixie faction—represent half of the present-day leadership dispute, which kicked off in 1999. FAC ¶ 25. The other half of the dispute is led by Silvia Burley—representing the Burley faction—who approached the tribe in 1998 while exploring her tribal roots. *Id.* ¶ 23. The Dixie faction enrolled Burley and her family as CVMT members, and Burley quickly gained esteem within the Tribe. *Id.* ¶ 23. That same year, CVMT established a General Council under the guidance and direction of the BIA, installing Yakima Dixie as the Chairman and Burley as a "person of authority." *Id.* ¶¶ 3, 23. The General Council's purpose was to carry out the wishes of Jeff Davis who, in 1935, had voted for the Tribe to organize under the IRA. *Id.* ¶ 24. To that end, the BIA took a hands-on approach in drafting a resolution governing the General Council, which stipulated "that the General Council had the authority to 'employ legal counsel' for the Tribe." *Id.* ¶ 27.c. Plaintiff alleges Burley, as a "person of authority," "had the authority by virtue this [sic] designation at the time to employ Plaintiff for his legal services on behalf of the Tribe." *Id.* Recall that Burley is the Tribe member who retained Plaintiff's legal services in 2007. *Id.* ¶ 17.

Soon after the General Council was formed, tension grew between the Dixie and Burley factions. *Id.* ¶ 25. Burley took the view that CVMT should refrain from organizing under the IRA, while Dixie thought organization the better course. *Id.* This disagreement

///

///

persisted for years, presenting what the BIA referred to as "a unique situation." *Id.* at 40.[2] For the next several years, the BIA took the position that CVMT "had no government, [so] it could not have a governmental leader." *Id.* at 41. Thus, the BIA declined to "recognize Ms. Burley as . . . a governmental leader," merely treating her as a "'person of authority' for the Tribe for the purposes of awarding Federal contracts." *Id.* ¶¶ 41, 43, 47, 49, 54.

In 2011, however, Assistant Secretary of the Interior-Indian Affairs ("AS-IA") Larry Echo Hawk issued a decision ("2011 Echo Hawk Decision") declaring the General Council to be the official governing body of the tribe. *Id.* ¶ 25. This decision—which effectively took Burley's side of the debate—was not to Dixie's liking, so Dixie brought a lawsuit in the United States District Court for the District of Columbia alleging violations of the Administrative Procedure Act ("APA"). *Id.* The court held that the 2011 Echo Hawk Decision was arbitrary and capricious because it failed to account for the true breadth of tribal membership which was much larger than the Decision presumed. *Id.*; *see Cal. Valley Miwok Tribe v. Jewell*, 5 F. Supp. 3d 86, 97–99 (D.D.C. 2013). The court vacated the 2011 Echo Hawk Decision and remanded it to the BIA for reconsideration. *Cal. Valley Miwok Tribe*, 5 F. Supp. 3d at 101.

On remand in 2015, AS-IA Kevin Washburn issued a new decision ("2015 Washburn Decision") reestablishing the BIA's previous position that the "United States does not recognize leadership for the CVMT government." FAC at 103. The 2015 Washburn Decision—echoing the District Court that ordered the remand—found that membership in the tribe was potentially much larger than previously acknowledged and stated that all of the potentially eligible members must be given the opportunity to participate in CVMT's reorganization. *Id.* at 104. Accordingly, AS-IA Washburn declared, "Ms. Burley and her family do not represent the CVMT," *id.* at 103, and permitted the Tribe to continue its organization efforts under the supervision of the BIA,

---

[2] The Court may consider attachments to a pleading to be part of the pleading. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

*id.* at 104.

All the while, CVMT was facing its multi-front war against the Commission which, like the BIA, struggled to maintain stable dealings with the Tribe's leadership vacuum, ultimately deciding in 2005 to terminate payouts to the Tribe pending resolution of the leadership and membership dispute. *Id.* ¶ 2. At that point, Plaintiff stepped in to represent the Tribe and entered into the Fee Agreement with Burley. *Id.* ¶ 17. Plaintiff initially asked the BIA for approval of the Fee Agreement in 2009, but the BIA declined. *Id.* ¶ 18. Plaintiff later asked the Department of the Interior ("Department") for approval in June 2023, but the Department also declined. *See* Order Granting Defendants' Motion to Dismiss ("MTD Order") at 3–4, ECF No. 15.

The Department's refusal to approve the Fee Agreement prompted Plaintiff to bring the present lawsuit, in which Plaintiff originally asked the Court to compel Defendants "to clarify Burley's status as a 'person of authority' with respect to the Fee Agreement [as required] by three sets of statutory provisions." *Id.* at 7. He also argued that the Department's inaction constituted arbitrary and capricious agency action. *Id.* at 9. Defendants moved to dismiss, and the Court granted the Motion, holding that Plaintiff failed to state a claim upon which relief could be granted. *Id.* at 9–10. The Court gave Plaintiff leave to amend so he could revise his theory. *Id.* at 12.

Plaintiff did just that and now sets his sights on the 2015 Washburn Decision as the source of his inability to collect his fees. Plaintiff sued Defendants in their official capacity, asserting that the 2015 Washburn Decision was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). FAC ¶ 36–40. He seeks declaratory and injunctive relief, effectively asking the Court to order Defendants to clarify that the 2015 Washburn Decision did not nullify Burley's authority to enter into the Fee Agreement with Plaintiff. *Id.* ¶ 35. Plaintiff also sues Defendants under the Federal Tort Claims Act ("FTCA") by alleging the 2015 Washburn Decision effected a negligent taking under the Fifth Amendment, *id.* ¶ 48, and Defendants negligently interfered with Plaintiff's prospective economic relations, *id.* ¶ 65.

/ / /

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction and thus have an obligation to dismiss claims for which they lack subject matter jurisdiction. *Demarest v. United States*, 718 F.2d 964, 965–66 (9th Cir. 1983). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When a party files a 12(b)(1) motion, "there is a presumption of a lack of jurisdiction until the plaintiff affirmatively proves otherwise." *Orient v. Linus Pauling Inst. of Sci. & Med.*, 936 F. Supp. 704, 706 (D. Ariz. 1996).

Under Federal Rule of Civil Procedure 12(b)(1), a party may raise by motion the defense that the complaint lacks subject matter jurisdiction via a facial or factual attack. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, such as the one here, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A court resolves a facial attack as it would a Rule 12(b)(6) motion: "Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient . . . to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

## ANALYSIS

Plaintiff's Complaint can be divvied into two buckets: the APA claims (Claims I–III) and the FTCA claims (Claims IV–V). Defendants challenge each respective bucket on multiple grounds, and the Court will likewise analyze the claims in those corresponding buckets.

## I.   APA Claims

Defendants raise several challenges to the APA claims. First, Defendants argue that the Court lacks subject matter jurisdiction over the claims because Plaintiff has not established Article III standing, specifically the injury-in-fact requirement. Mot. at 22–24. But even if Plaintiff has Article III standing, Defendants say, he lacks prudential standing

because his alleged injury does not fall within the zone of interests protected by any federal statute. *Id.* at 26. Beyond their standing arguments, Defendants also challenge the APA claims on statute of limitations, *id.* at 19, res judicata, *id.* at 26, and failure to state a claim grounds, *id.* at 28. Finally, Defendants contend that Plaintiff's first two claims for declaratory and injunctive relief are improper causes of action. *Id.* at 29.

### A.    Article III Standing

Article III standing pertains to the Court's subject matter jurisdiction, *see Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011), and "[t]he party asserting federal subject matter jurisdiction bears the burden of proving its existence," *Jackson v. City and Cnty. of San Francisco*, 829 F. Supp. 2d 867, 870 (N.D. Cal. 2011). Article III standing requires that the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In dispute here is whether Plaintiff has satisfied the first prong by establishing that he suffered an injury-in-fact. To establish injury-in-fact, the plaintiff must suffer "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotations and citations omitted). "Particularized injuries 'affect the plaintiff in a personal and individual way,' while a 'concrete injury must be *de facto*; that is, it must actually exist.'" *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1151 (9th Cir. 2017) (quoting *Spokeo*, 578 U.S. at 339).

Defendants argue that Plaintiff's alleged injury is too speculative to constitute an injury-in-fact. Mot. at 23. The alleged injury, according to Defendants, is Plaintiff's inability to recover the fees he says he is entitled to under the Fee Agreement. *Id.* Plaintiff, however, has no present right to recover his fees, according to Defendants, because that right depends upon a "chain of events" involving "multiple levels of individuals," beginning with the Tribe's successful organization and adoption of a tribal governing

document.  *Id.* at 24.

Plaintiff counters that his damages are not speculative at all.  Opp'n at 21.  In fact, his damages "are sum certain damages [comprising] calculated fees at $250 per hour and a percentage of the RSTF payments that were withheld at the time Plaintiff stopped his work for the Tribe in 2020."  *Id.*  In Plaintiff's view, his injury is not a future inability to collect, but rather the deprivation of "fees already earned to which he is entitled."  *Id.* at 23.

The way in which the Court defines Plaintiff's injury can be dispositive of whether or not he has Article III standing.  *See, e.g.*, *Cummings v. Smith*, 106 F.3d 407, at *2 (9th Cir. 1997) (Norris, J., dissenting) (unpublished opinion) ("The majority goes astray when it defines the injury . . . ."); *McMichael v. Napa County*, 709 F.2d 1268, 1270 (9th Cir. 1983) (describing the parties' competing definitions of what the plaintiff's injury was).  Under Defendants' definition, Plaintiff merely has a speculative future injury that will only materialize in the hypothetical event that the Commission releases the RSTF funds and Plaintiff is then denied his attorney's fees.  But under Plaintiff's definition, the injury has already occurred because Plaintiff was denied payment when his services were terminated in 2020.

The Court finds neither Party's definition compelling.  Under the facts as alleged by Plaintiff, Plaintiff has no present entitlement to the fees, nor does he have a non-speculative future interest.  Under the Fee Agreement, Plaintiff was initially compensated at a guaranteed rate of $250 per hour, plus a 15% contingency fee of the Commission funds conditioned upon CVMT's recovery of the RSTF payments.  *See* FAC at 33–34.  For the first five months, Plaintiff received payment for his hourly services, but at that point his "payment was suspended and deferred *until funds held by the Commission were released*." *Id.* ¶ 17 (emphasis added).

That revision to the original payment schedule was memorialized and agreed upon in an amendment to the Fee Agreement, executed by Plaintiff and Burley on March 10, 2009.  *Id.* at 30–31.  According to the amendment, which Plaintiff attached to his First Amended Complaint, Plaintiff's contingency fee was increased to 20% of the RSTF

payments recovered from the Commission, but in exchange, Plaintiff was to front the cost of his legal expenses and defer payment of "any and all fees owed under the original agreement," which were to be paid from the recovered RSTF funds. *Id.* at 31. The upshot of this arrangement is that, under the Fee Agreement as amended, Plaintiff is not entitled to any compensation from CVMT unless and until the Tribe recovers RSTF funds from the Commission.

Therefore, though no one disputes that a "[p]ecuniary injury is clearly 'a sufficient basis for standing,'" *Cent. Ariz. Water Conservation Dist. v. Env't Prot. Agency*, 990 F.2d 1531, 1537 (9th Cir. 1993) (quoting *Fair v. Env't Prot. Agency*, 795 F.2d 851, 853–54 (9th Cir. 1986)), Plaintiff has not suffered a pecuniary injury because he has not been deprived of any fees to which he is entitled. Only after CVMT recovers its funds from the Commission will Plaintiff's right to collect his fees be triggered. Until that time, Plaintiff cannot be said to have suffered a pecuniary injury.

But Defendants are also incorrect to say that Plaintiff has not suffered an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560. Plaintiff alleges the 2015 Washburn Decision "nullif[ied] the Fee Agreement Burley entered into with Plaintiff in December 2007 and interfere[d] with Plaintiff's legal relationship with the Tribe and bar[red] his recovery of fees." FAC ¶ 32. In other words, Plaintiff alleges the BIA stripped him of his contractual right under the Fee Agreement to seek attorney's fees for the thirteen years of work he performed for the Tribe.

When a plaintiff "has alleged that the obligations of his contract had been 'taken away or materially lessened,'" he satisfies the injury-in-fact requirement. *Iten v. Los Angeles*, 81 F.4th 979, 992 (9th Cir. 2023) (quoting *Lynch v. United States*, 292 U.S. 571, 580 (1934)). The Ninth Circuit illustrated this principle in *Lazar v. Kroncke*, 862 F.3d 1186 (9th Cir. 2017). In *Lazar*, the plaintiff brought a Contracts Clause challenge against the bank that sponsored her deceased ex-husband's individual retirement account ("IRA"). *Lazar*, 862 F.3d at 1192. The administrator of the ex-husband's estate made a demand on the bank to freeze the IRA under Arizona's revocation-on-divorce ("ROD")

statute, essentially "freezing" out the plaintiff from control of the IRA, which she was a named beneficiary on. *Id.* The plaintiff brought suit to prevent this from happening. *Id.*

The district court dismissed the plaintiff's Contracts Clause challenge "because she possessed only an expectation interest in IRA [sic]," but the Ninth Circuit reversed. *Id.* at 1198. On appeal, the court held that the plaintiff had standing to challenge Arizona's ROD statute, but not necessarily because of an economic injury that the plaintiff suffered. *Id.* at 1198–99. Rather, because the "ROD statute operated to extinguish [the plaintiff's] valid expectancy interest in the IRA—an injury which is actual, concrete, and particularized," she suffered an injury-in-fact. *Id.*

The same can be said here. Plaintiff alleges the 2015 Washburn Decision "interfered and meddled in Plaintiff's legal relationship with the Tribe," FAC ¶ 38, effectively nullifying the Fee Agreement that Plaintiff had entered into with Burley. Although the Court agrees with Defendants' contention that Plaintiff has a mere expectancy interest in his attorney's fees because they are contingent upon release of the RSTF funds from the Commission, it is not Plaintiff's speculative inability to recover his fees that constitutes the injury. Instead, it is BIA's alleged *extinguishment* of his expectancy interest in the attorney's fees, which is a contractual interest rooted in the Fee Agreement between Plaintiff and Burley. This alleged nullification of Plaintiff's contractual rights is the proper place to locate his injury-in-fact. *See Child.'s Health Def. v. Fed. Commc'n Comm'n*, 25 F.4th 1045, 1049 (D.C. Cir. 2022) ("Potential impairment of contractual or property rights can create an injury in fact.").

That said, at the pleading stage, "a plaintiff who seeks to challenge [agency action] must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508. That "[t]he plaintiff must allege facts, not mere legal conclusions, in compliance with the pleading standards established by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)" is well settled. *Leite*, 749 F.3d at 1121. Thus, a conclusory allegation of harm will not suffice to satisfy the

injury-in-fact prong.

Yet a conclusive allegation of harm is all Plaintiff proposes. Plaintiff alleges that, in 2015, "Washburn nullified Burley's designation as a 'person of authority' for the Tribe and nullified the authority she had in 2007 as the authorized representative for the Tribe to enter into the Fee Agreement with Plaintiff." FAC ¶ 25. But viewed in the context of what the 2015 Washburn Decision actually says, Plaintiff makes quite the leap to reach the legal conclusion that the Decision nullified the Fee Agreement, or that Burley ever had the authority to enter into it in the first place.

Before continuing, the Court notes that this part of the analysis creeps into the causation prong, which was not briefed by either party. However, "a district court's duty to establish subject matter jurisdiction is not contingent upon the parties' arguments." *United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966 (9th Cir. 2004)). Thus, the Court has an independent obligation to consider the causation and/or redressability prongs of the Article III standing inquiry with or without briefing from the parties.

To establish causation, the Court must assure itself that there is "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 555. But here, Plaintiff has not alleged any "specific, concrete facts" to show that the 2015 Washburn Decision was a de facto cause of his injury. *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1190 (9th Cir. 2023) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

Plaintiff's claims revolve around Burley's designation as a "person of authority," but Plaintiff does not adequately "allege specific, concrete facts" that Burley's designation as such had any tangible impact on the Fee Agreement. *See Warth*, 422 U.S. at 508. The relevant specific facts that Plaintiff alleges are these. The BIA recognized Burley as a "person of authority" from 1999 until 2004. FAC ¶ 27.c. The BIA entered into federal contracts with the Tribe from 1999 until 2009 through Burley because she was a "person of authority" for the Tribe. *Id.* ¶ 27.d. And the General Council of the Tribe had the

authority to employ legal counsel on behalf of the Tribe. *Id.* ¶ 27.c.

Plaintiff jumps from these three basic premises to reach the legal conclusion that Burley, as a "person of authority," had the legal authority on behalf of the General Council to enter into the Fee Agreement. Even taking these "allegations as true and drawing all reasonable inferences in the plaintiff's favor," the Court is unable to say that Burley's "person of authority" status had any legal import as applied to the Fee Agreement. *See Leite*, 749 F.3d at 1121. Plaintiff fails to connect the dots by alleging facts tying Burley's status for purposes of awarding federal contracts to her status for purposes of entering into third party retainer agreements with legal counsel. Simply because the BIA entered into contracts with Burley does not equate to Burley being the General Council's designated representative to enter into third party contracts. Thus, Plaintiff's conclusory allegation that the 2015 Washburn Decision nullified Burley's status as a "person of authority" does not necessarily render any harm to Plaintiff because Plaintiff does not allege specific, concrete facts to show that Burley's "person of authority" label was relevant to the Fee Agreement.

But even if the Court accepted that, as a "person of authority," Burley entered into a valid Fee Agreement with Plaintiff, the Court is still unable to conclude that the 2015 Washburn Decision plausibly nullified that status nor that it nullified the Fee Agreement. The 2015 Washburn Decision makes no mention of Burley's "person of authority" designation and, indeed, Plaintiff concedes as much in his Opposition by admitting that "there is nothing in the 2015 Washburn Decision discussing Burley's BIA-designated status as the 'authorized representative' or 'spokesperson' of the Tribe and what that meant." Opp'n at 25. Nor does the 2015 Washburn Decision make any mention of the Fee Agreement or its validity in light of the BIA's conclusion that "[t]he United States does not recognize leadership for the CVMT government." FAC at 103. As noted above, Plaintiff's alleged injury-in-fact was the extinguishment of his expectancy interest in the Fee Agreement, but he has not alleged specific, concrete facts to plausibly show that the 2015 Washburn Decision impacted that expectancy interest. *See Warth*, 422 U.S.

at 508.  At most, as far as causation is concerned, he has only alleged legal conclusions that fall short of the plausibility standard.

Therefore, Plaintiff has not met his burden to demonstrate Article III standing as it pertains to his APA claims because he has not plausibly alleged that his injury-in-fact is fairly traceable to the 2015 Washburn Decision.  Moreover, as Plaintiff concedes in his Opposition, his first two claims for declaratory and injunctive relief are improperly labeled as causes of action rather than remedies.  Opp'n at 31.  As this Court explained in its Order dismissing Plaintiff's original Complaint, these claims must fail alongside his APA claim as Plaintiff is using the claims offensively but ties them to no viable cause of action for which this Court has jurisdiction.  *See* MTD Order at 11 (citing *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 879 (9th Cir. 2022); *Rolle v. Robel*, No. CV-23-00336-PHX-SMM, 2024 WL 342457, at *6 (D. Ariz. Jan. 30, 2024); *Lorona v. Ariz. Summit L. Sch., LLC*, 151 F. Supp. 3d 978, 997 (D. Ariz. 2015)).  As a result, the Court **GRANTS** Defendants' Motion as to the First Amended Complaint's APA claims (Claims I–III).

### B.    Prudential Standing

Although the Court could stop here, in the interest of judicial economy it will briefly comment on Defendants' argument that Plaintiff lacks prudential standing.  Defendants argue that Plaintiff's APA claims are subject to the "zone of interests" test, which requires that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  Because "Plaintiff has failed to identify any statute that has allegedly been violated in any way by Defendants or any statute within which Plaintiff has an interest in order to bring his APA claims," Defendants contend he cannot satisfy the "zone of interests" test.  Mot. at 26.[3]

Plaintiff responds by pointing to the disjunctive nature of 5 U.S.C. § 702, which

---

[3] The Court declines to address Defendants' alternative argument at this time that Plaintiff "has not suffered or alleged an 'invasion of a legally protected right.'"  *See* Mot. at 26.

provides his right to judicial review. Section 702, Plaintiff points out, provides that a "person **suffering legal wrong** because of agency action, **or** adversely affected or aggrieved by agency action withing [sic] the meaning of a relevant statute, is entitled to judicial review thereof." Opp'n at 19 (emphasis in original). Here, Plaintiff says, he is bringing suit under the "suffering legal wrong" prong, or as Plaintiff calls it, the "general review" provision, and a plaintiff bringing suit under that prong "is not required to show his or her injuries were within the 'zone of interests' sought to be protected under a statute." *Id.* at 20 (citing *BNSF Railway Co. v. Equal Emp. Opportunity Comm'n*, 385 F. Supp. 3d 512, 526 (N.D. Tex. 2018)).

Though Defendants acknowledge that the Supreme Court has not directly held that the "zone of interests" test applies to the "legal wrong" prong of § 702, Reply at 7 n.10 (citing *California v. Trump*, 963 F.3d 926, 957 n.9 (9th Cir. 2020) (Collins, J., dissenting)), they persuasively argue that the Ninth Circuit has adopted their preferred interpretation. In *Kingman Reef Atoll Investments, L.L.C. v. United States Department of Interior*, the Ninth Circuit comprehensively canvassed the existing case law in rejecting the plaintiffs' contention that the "zone of interests" test "may not apply to plaintiffs who come under the 'legal wrong' prong of § 702." 195 F. Supp. 2d 1178, 1183–84 (9th Cir. 2002). As stated by the court in that case:

> In sum, the court is unaware of any Ninth Circuit case explicitly holding that the 'zone of interests' test is inapplicable to those claiming a 'legal wrong' under § 702, while several Ninth Circuit and Supreme Court cases presume or suggest that it does apply. The "zone of interests" test appears to be a fundamental requirement of prudential standing. The court declines to create new law in the Ninth Circuit by holding that the "zone of interests" test does not apply to those who allege a "legal wrong."

*Id.* at 1185.

The Court need not decide now whether this language from *Kingman Reef* is

controlling in this case, but it raises the specter that Plaintiff's APA claims may be subject to the "zone of interests" test despite his reliance on the "legal wrong" prong of § 702. Indeed, the lone citation that Plaintiff provides in his Opposition to *BNSF Railway* out of the Northern District of Texas directly contradicts the position for which he is advocating with regard to application of the "zone of interests" test. *See* 385 F. Supp. 3d at 527 ("Absent clarification from the Supreme Court or the Fifth Circuit on whether the zone-of-interests test is a gloss on only the 'adversely affected' clause of § 702 or a judicially crafted prudential limit on all APA claims, the Court therefore finds it is bound to follow the latter interpretation . . . ."). Plaintiff will need to surmount the Court's skepticism of his argument if chooses to amend his Complaint.

### C.    *Statute of Limitations*

The Court will also offer a brief comment on Defendants' statute of limitations argument in the interest of judicial economy. Simply put, Defendants argue that, because Plaintiff's right of action accrued when the BIA issued the 2015 Washburn Decision, his APA claims are time-barred under 28 U.S.C. § 2401(a).[4] Plaintiff responds by invoking the "reopening doctrine," identifying a 2022 decision issued by AS-IA Bryan Newland ("2022 Newland Decision"), which Plaintiff argues restarted the six-year clock for which he is able to bring his APA claims.

Under 28 U.S.C. § 2401(a), suits against the United States "shall be barred unless the complaint is filed within six years after the right of action first accrues." This Section "is the statute of limitations that applies to claims brought pursuant to the APA." *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 896 (D. Ariz. 2003), *aff'd*,

---

[4] Defendants initially argued in their Motion that Plaintiff's APA claims accrued when the agency action became final. *See* Mot. at 10 (citing *Wind River Min. Corp. v. United States*, 946 F.2d 710, 713–15 (9th Cir. 1991)). But in their Reply, Defendants recognize that under *Corner Post, Inc. v. Bd. Of Governors Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024), which was decided after they filed their Motion, a cause of action accrues when the plaintiff is injured by the final agency action. Reply at 3. The distinction is immaterial in the present case because, under either formulation of the test, Plaintiff's cause of action accrued in 2015.

417 F.3d 1091 (9th Cir. 2005). There is no dispute that § 2401(a) applies to Plaintiff's APA claims nor is there a dispute over whether more than six years have elapsed from the 2015 Washburn Decision until Plaintiff brought suit.

The dispute goes to what effect the 2022 Newland Decision might have on the statute of limitations bar. A bit of background is necessary on the 2022 Newland Decision to analyze what impact it might have, but because the Court has already determined that it does not have jurisdiction over these claims, it will not interrogate the factual foundation of the Decision. Simply put, in 2019, "various parties challenged the factual conclusions underpinning the Washburn Decision during a Secretarial Election conducted to organize the Tribe." FAC at 108. These factual conclusions pertained to the genealogical record that AS-IA Washburn relied upon in determining the breadth of the greater Tribal community. *Id.* at 109. The BIA had essentially proceeded on the erroneous assumption that certain individuals were descendants of Jeff Davis, though it later turned out that this belief was mistaken. *Id.* The BIA released the 2022 Newland Decision to correct this inaccuracy and to clarify that "the descendants of the Miwok Indians on the 1929 Census shall be included among the Eligible Groups, able to take part in the initial organization of the Tribe." *Id.* at 112. In promulgating this clarification, AS-IA Newland also averred that "[e]xcept as otherwise inconsistent with the inclusion of this group as an Eligible Group, [he] endorse[s] and reaffirm[s] the Washburn Decision in its entirety." *Id.*

Plaintiff argues that, under the Reopening Doctrine, he is not time-barred from challenging the 2015 Washburn Decision because it was "re-opened" by the 2022 Newland Decision. Under this doctrine, "when [a] later proceeding explicitly or implicitly shows that the agency actually reconsidered [a] rule, the matter has been reopened and the time period for seeking judicial review begins anew." *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998). Although the doctrine has firm footing in the D.C. Circuit, "[t]he Ninth Circuit has not addressed the question of whether the reopening doctrine is law in this circuit." *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1045 (N.D. Cal. 2013). Nonetheless, "[c]ourts within

the Ninth Circuit have applied the reopening doctrine," and this Court finds it appropriate to do the same. *See Doe. v. U.S. Dep't of Just.*, 650 F. Supp. 3d 957, 984 (C.D. Cal. 2023).

Defendants do not grapple with Plaintiff's application of the reopening doctrine with much force other than to respond in a footnote that the doctrine is only "applicable to APA challenges to agency regulations and promulgated rules issued through a notice and comment process." Reply at 5 (citing *Doe*, 650 F. Supp. 3d at 984). The Court is inclined to agree that the doctrine is most naturally applied to agency actions emerging out of rulemaking procedures, *see Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990) (citing *Ohio v. U.S. Env't Prot. Agency*, 838 F.2d 1325 (D.C. Cir. 1988), for the proposition that the court "must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened"), but Defendants' cited case can hardly be read to establish a bright-line rule that the reopening doctrine is limited just to the fruits of the notice and comment process. Indeed, at least one court within the Ninth Circuit has extended the reopening doctrine beyond the confines of agency rulemaking. *See, e.g.*, *SLPR, LLC v. U.S. Army Corps of Eng'rs*, No. 06 CV 1327 MMA (POR), 2011 WL 1648732, at *4–5 (S.D. Cal. May 2, 2011).

However, even if the Court were to extend the doctrine to the proceedings at issue here—proceedings that were not performed through notice-and-comment—an agency does not reopen "a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter." *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996). When applying this principle to the agency actions at issue, the Court harbors doubt as to whether the 2022 Newland Decision can be read to reopen the specific issue that Plaintiff complains of, namely Burley's status as a "person of authority." As the D.C. Circuit cautioned, "[t]he 'reopening' rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Am. Iron & Steel Inst. V. U.S. Env't Prot. Agency*,

886 F.2d 390, 398 (D.C. Cir. 1989). It is far from clear that AS-IA Newland reopened the 2015 Washburn Decision in any way that bears on Burley's authority to enter into the Fee Agreement.

In any event, the Court need not reach these issues now, which have been seldom explored in this Circuit. It merely raises these concerns to alert the Parties that the Court is doubtful of Plaintiff's ability to overcome this obstacle if he chooses to file an amended complaint.[5]

## II.    FTCA Claims

In addition to his APA claims, Plaintiff brings two new claims in his First Amended Complaint under the FTCA. Plaintiff alleges the United States, through the 2015 Washburn Decision, negligently deprived Plaintiff of his property under the Takings Clause of the Fifth Amendment (Claim IV) and negligently interfered with Plaintiff's prospective economic relations (Claim V).[6] FAC ¶¶ 41–69. Defendants contend the jurisdictional prerequisites of suing the United States have not been met because 1) Plaintiff failed to exhaust his administrative remedies, 2) Plaintiff failed to satisfy the statute of limitations, 3) the United States has not waived sovereign immunity as to these claims, and 4) Plaintiff's claims are barred by the intentional tort exception to the FTCA. Mot. at 32–35.

"Under settled principles of sovereign immunity, the United States, as sovereign, is immune from suit, save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Dalm*, 494 U.S. 596, 608 (1990) (internal quotations omitted). "The FTCA provides a limited

---

[5] The Court declines to address Defendants' remaining arguments as to Plaintiff's APA claims, but that silence is not to be construed as tacit disapproval of those arguments. They are simply beyond the scope of what the Court determines necessary to comment on at present.

[6] To the extent Plaintiff asserts a constitutional violation against Defendants under 42 U.S.C. § 1983, *see* FAC ¶¶ 42–44, it is well settled that "§ 1983 provides no cause of action against federal agents acting under color of federal law . . . ," *Billings v. U.S.*, 57 F.3d 797, 801 (9th Cir. 1995) (citing *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987)).

23-CV-1876 JLS (DDL)

waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment." *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000) (citing *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995)).

The FTCA requires any claimant to first file a claim with the appropriate federal agency and await final denial before commencing a civil action—in other words, the claimant must first exhaust his administrative remedies. 28 U.S.C. § 2675(a); *Burns v. United States*, 764 F.2d 722, 724 (9th Cir. 1985). The § 2675(a) requirement "is jurisdictional in nature and may not be waived." *Jerves v. United States*, 966 F.2d 517, 519 (9th Cir. 1992) (citations omitted). Actions filed prior to presentation of the claim to the agency, final denial of the claim by the agency, or allowing six months to elapse from the date of filing of the administrative claim fail to meet this requirement and are properly dismissed for lack of subject matter jurisdiction. *See id.* Thus, "a prematurely filed FTCA claim must be dismissed even if the plaintiff ultimately exhausts his administrative remedies before 'substantial progress' has occurred in the case." *D.L. by & through Junio v. Vassilev*, 858 F.3d 1242, 1245 (9th Cir. 2017) (citing *McNeil v. United States*, 508 U.S. 106, 110 (1993)).

Plaintiff failed to exhaust his administrative remedies prior to bringing his FTCA claims against the United States. Plaintiff alleges he submitted his FTCA claims to the United States on March 25, 2024. FAC ¶¶ 55, 69. He then filed his First Amended Complaint, which asserts the two FTCA claims at issue against the United States, the very next day. *See generally* FAC (filed on March 26, 2024). Clearly, six months had not elapsed between Plaintiff submitting his FTCA claims to the United States and the filing of his First Amended Complaint. And Plaintiff does not allege he received a lightspeed rejection of his administrative claims the same day the claims were submitted.

Plaintiff concedes as much. FAC ¶¶ 55, 69. However, citing *Junio*, he argues that he can wait the requisite six months before serving these claims on Defendants. FAC ¶¶ 55, 69. In other words, Plaintiff insinuates that he can satisfy the exhaustion requirement by

waiting six months after submitting his FTCA claims to the United States before *serving* the First Amended Complaint even if he *filed* the First Amended Complaint before that.

Plaintiff overlooks the fact that he has service obligations under the Federal Rules of Civil Procedure and cannot withhold certain claims from the First Amended Complaint once they have been filed.  As a general matter, Federal Rule of Civil Procedure 5 "governs service of 'every pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants.'"  *Emp. Painters' Trust v. Ethan Enters., Inc.*, 480 F.3d 993, 999 (9th Cir. 2007) (quoting Fed. R. Civ. P. 5(a)).  Where, as here, "the amended complaint [is] filed electronically, it will be deemed served upon filing." *Fontanez v. Hicks*, No. 2:20-cv-20286-KSH-CLW, 2021 WL 1608902, at *4 (D.N.J. Apr. 23, 2021) (citing Fed. R. Civ. P. 5(b)).  Plaintiff, therefore, served his FTCA claims on the United States as of the moment he filed the First Amended Complaint.  The FTCA's exhaustion requirement cannot be so neatly evaded.

But even if he could somehow withhold the new FTCA claims from the First Amended Complaint and wait six months before serving them, the Supreme Court has made clear that it is the premature "invocation of the judicial process"—that is, the *filing* of an FTCA claim against the United States—before "complete exhaustion of Executive remedies" that is fatal to the claim.  *McNeil*, 508 U.S. at 112.  In justifying this admittedly strict rule, the Court noted that "[e]very premature filing of an action under the FTCA imposes some burden on the judicial system," *id.*, and that "[t]he interest in orderly administration of this body of litigation is best served by adherence to the straightforward statutory command," *id.* at 113.  As a result, plaintiffs must allow six months to elapse after the initial filing of the administrative claims before asserting FTCA claims in a lawsuit regardless of when the claims are eventually served.  *See Jerves*, 966 F.2d at 519 ("[The plaintiff] *commenced* this action . . . without allowing six months to elapse from the date of her initial administrative filing." (emphasis added)).

To be sure, the Ninth Circuit has given its blessing to certain scenarios where a plaintiff may amend a complaint to add a new FTCA cause of action not previously

asserted.  *See Junio*, 858 F.3d at 1246 (permitting amendment adding exhausted FTCA claim where the plaintiff originally filed non-FTCA claims in state court and "was not aware that one of the defendants was an employee of the United States"); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. 2011) (permitting amendment adding exhausted FTCA claim where the plaintiff filed suit in federal court but only alleged "claims under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), against parties other than the United States").  But in this instance, the claims cannot be cured by amendment because Plaintiff invoked the judicial process when he filed the FAC and had not yet exhausted his administrative remedies.  *See Moreno v. United States*, No. 21-cv-1069-WQH-AGS, 2022 WL 891114, at *3 (S.D. Cal. Mar. 25, 2022).

Accordingly, the Court **GRANTS** Defendants' Motion as to the First Amended Complaint's FTCA claims (Claims IV–V).  These claims are **DISMISSED WITHOUT PREJUDICE** and **WITHOUT LEAVE TO AMEND** as amendment would be futile. *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) ("[T]he district court may exercise its discretion to deny leave to amend due to . . . 'futility of amendment.'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).[7]

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 21) and **DISMISSES** the Complaint **WITHOUT PREJUDICE**.  As the Court cannot find that amendment to the APA claims would be futile, the Court also grants Plaintiff **LEAVE TO AMEND** with respect to Claims I–III.  *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004) ("Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.").  Plaintiff **MAY FILE**

---

[7] The Court acknowledges that Plaintiff filed related case *Corrales v. United States, et al.*, 24-CV-1773 JLS (DDL) (S.D. Cal. filed Oct. 4, 2024), in which he purportedly cured the exhaustion-related defects noted above.  That case has since been transferred from Judge Bencivengo to Judge Sammartino, so both this case and the related case are now before the same Judge.  *See id.* The Court declines to comment any further on the merits of that case.

an amended complaint <u>within twenty-one (21) days</u> of the date of this Order.  Any amended complaint must be complete by itself without reference to the original Complaint; any defendant not named and any claims not realleged in the amended complaint will be considered waived.  *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).  ***If Plaintiff fails to amend within the time provided, the Court will enter a final Order dismissing this civil action.***  *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action.").

**IT IS SO ORDERED.**

Dated:  December 19, 2024

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

23-CV-1876 JLS (DDL)